Morning, I am Valerie Brown for the appellant, Dawn Webster. And I would like to try and reserve five minutes for rebuttal. All right, thank you. You may proceed. Because of the greater potential impact to Mr. Webster's sentence, I'd like to address the drug quantity issue first. And then discuss fraud, force, and coercion, and finally restitution if there is time. I'd like to make three points about the drug quantity calculation. First, even assuming the district court's methodology was valid, the court failed to separately apply its 50% correction factor to the government's estimated quantity for the under 21 grouping. And that alone is reversible error. Now, we got, who gave us this? That's from the government, but it is excerpts out of the record, and I've seen it, and I'm happy to talk about it. All right, I'm just pointing to something that was put at our bench before we arrived this morning. The other two points I'd like to make about drug quantity calculation are alternative arguments to that. First, the district court's methodology wasn't valid because he didn't properly apply the test that this court uses in CULPS. He failed to make any findings about the drug estimate to determine if there was sufficient indicia of reliability. And he failed to err on the side of caution in selecting between the variables and applying the reduction factor. So what about the fact that obviously the district judge heard all of these witnesses, right? Because there was a jury trial. Yes. So we're not in that, and admittedly, the type of case that this is, you know, we're not pulling people out of the convent that, you know, that are, I mean, obviously we're talking, you know, underage, prostitution, drug use, you know, any, you know, all of those things. And so we're, you know, but the district court did hear all of these people. So was in a position to decide, make some credibility determinations about them. Correct. But at sentencing, he didn't make any findings on the record. He didn't go through the charts and the information offered by the government. Does the district court have to use the, do you have any authority for the fact that the lowest possible number has to be used? Yes, I cited several cases in my brief that talk about- But do they really say the lowest possible number? I mean, you have to err on the side of caution. No, not the lowest possible number. The lowest number that's supported by reliable evidence. So in the cases where there was a range, that the entire range was reasonable. I'm thinking of the drug flask case where the judge said there's evidence, there's enough evidence to support the glassware was used twice. And there's enough waste product to support that. So I'm going with, there was two complete cook cycles using that glassware. And the government had argued for a much higher number. And those cases where there's reliable evidence, the lowest possible number is erring on the side of caution. Well, but the district judge was confronted with, the testimony was that it was crack cocaine and there was discussion about using powder numbers or crack numbers, right? The judge in the end at sentencing used only cocaine numbers, so that's not at issue. He did not use the crack sentencing guidelines. Okay, so that is acceptable to you? Yes, that was not challenged. Okay. Do you need any more than the government's concession of error in a calculation of weeks and days to get a resentencing? If I completely understand your question, the answer is no. I'll state that the way I see it, and you tell me if that's not the question you're asking me. The government basically says, they talk about it on page 58. What I'm asking you about is, it looks to me as though the government concession of error alone requires resentencing, because it's not harmless error. It generates a different guidelines range. Correct. I'm wondering if you need any more than that. No, I don't think so, because if the judge had applied the 50% to the under 21 grouping, we would have been at a different offense level, and sentencing would have been required. And they basically concede that at page 58 of their brief. They say, if I can't argue below 3.5 kilograms, it's harmless error. But if you apply 50% to just the numbers for the under 21 grouping, and if you apply the 50% discount to all of the variables that are on the two charts the government gave you, we're well below the base offense level that the district court started with. And yes, so remand for resentencing is the appropriate remedy. And I think in this case, this may be one of the cases where estimation shouldn't have been allowed at all, because of the nature of the testimony. The district court saw the women testify, but their testimony was very halting and unsure. And even some of the numbers that made it onto the government's chart were bracketed by the words, I don't know, I don't know. But that can't be entirely right, that because you take your victims as you get them to some extent. And that in this type of case, they're going to probably be crack addicted prostitutes, underage, not all of the above. They're not, they didn't graduate from Stanford, Harvard, and Yale Law School, and are unaddicted. So it still can't mean, and if you look at what the statutory scheme, and it requires restitution, so we're never going to get the type of, it can't mean it has to be totally exact in that situation. It just can't, because then we make those victims in a completely different class of people that we say per se, they're not entitled to restitution, that can't be right, because they're all going to be like that. I'm sorry, are we talking about restitution or drug quantity estimates? Well, you were talking- The evidence is essentially the same for both. So I think, yes, the estimates are always going to be uncertain. And that's the reason you have to err on the side of caution, because it's fundamentally the basis of sentencing. And so, they are always going to be halting. And in my brief, I discussed the Valdez case, which is an unpublished decision of the Ninth Circuit. And I presented the cases from the other circuits that talk about, it doesn't matter that they were prostitutes, and most of them weren't underage. What matters is that they were heavy drug users, admitted addicts, and it impairs their memory. And the judge has an extra duty in that case to make some findings and to make some exacting decisions about the things that they say. Because, yes, you do take the victims as they were, but they were drug addicts. And that affects the reliability of their testimony. And you- But the judge is also armed here with a certain credibility finding that was made by the jury. Because they- The jury made no findings on quantity. And there was no quantity charged. All they had to find was that there was a distribution of some amount of cocaine. So there is no jury finding to rely on for the drug quantity estimate. Could you help me on one other aspect of the case? I realize it's not your focus. I keep understanding and then not being sure I understand the argument on the jury instruction error. Sure. I've got the statute in front of me and I've got the instruction in front of me. Yeah, I- Tell me what the problem is. Yeah, basically the jury was charged that force means any form of violence, compulsion, or constraint exercised upon or against a person. Okay, so if that misstates the law, then we have a problem because it- Yep, and why does it? Why does it? Because force, the compulsion component of that allowed the jury to base their entire decision on drug use. And so my argument is that the provision of cocaine and the use- Why does that matter? The way the statute says it is force, fraud, or coercion. Yes. Okay, the government's argument was that it was either force because of the drug addiction, or it was coercion because there was a scheme, plan, or pattern that involved violence and drug use. So under both coercion and force, drugs necessarily came in, and what I'm arguing is that drug use, voluntary drug use, falls outside the statutory definition of force and coercion, at least as it existed at the time of this conviction and trial. The statutory definition of coercion has now been much more liberally defined. Okay, this is where it's getting away from me. I just lost you on that last answer. Okay, let me step away and grab my statute. I'm not sure which part is confusing, so I'm struggling with where to start. The force charge, if the plain language of the statute, force, fraud, or coercion, my argument that force centers on actual physical force restraint. Drug use isn't that. The government said many, many things, but the short version of one of the things they said was that- I don't care what the government said, I care what the judge said, if I'm looking for instructional error. So the statute says force, the judge says force. Yes, and by defining force to mean compulsion, that combined with all the evidence the jury had and what- Are you looking at any definitional language other than line, page, let's see, it says page 1, colon 240 of appellant's excerpts. Starts at line 24 and it goes over to line 1 of the next page. Are you looking anywhere else? I'm assuming that's the jury instruction and that's the only place it occurs. Okay. But when they were charged with that, they were told that sabotaging somebody with crack cocaine is a clear form of force. And I think that by using- Was that in the instruction? That's not in the instruction, that's what the government said. What do I care what the government said? But the judge didn't clarify that. Instructional error. I mean, when I defended, I used to love it when the prosecutor misstated the law and then I could tell the jury basically he lied to you about what the instruction was saying. Right, no, I understand the question. It doesn't matter, but it highlights what I'm trying to say about compulsion, which is it took this physical element of the statute, which is fraud, force, or coercion, and allowed them to take voluntary drug use and use that as a violation of 1591, which requires force to be used to compel a commercial sex act. It doesn't have to be force, it can also be coercion. Correct. And under coercion, they also would have had to use the voluntary use of drugs to conclude that there was coercion. How do you distinguish this case from US v Todd? Which the facts seem very similar to your case, where each girl voluntarily agreed to start working for the defendant, but still found Todd's overall method of controlling the girl's life amounted to coercion. In Todd, the testimony was that he had rules, including a rule that they had to make a certain amount of money a day. And if they didn't do it, he threatened to beat them, or he did beat them. But these young women, some of them got beat, some of them saw beatings. It was almost, there's blood in, blood out, almost. They weren't allowed to leave. They took their cell phones, one took, I think, the cross, and basically stripped them down to nothing. Yes, there were violent acts. There was testimony about a lot of violent acts, but there was no, unlike Todd, there was no tie between the testimony that they were beaten or the even more gruesome things that happened had anything to do with commercial sex. They all said the penalty for not going on a date was not getting drugs. There was no testimonial tie, and there was no other evidence, that the violence was the reason or the punishment for the commercial sex acts. Well, that, I don't know, that seems to be splitting hairs in the sense that if you see other people get beat up, and you don't have to be a rocket scientist to see if that's what happens to people for minor violations or any number of things that it, you know. My alternative argument is that it's a sufficiency of the evidence problem and not a jury charge problem, because the way you're stating it is the way the government presents it in its overview. But when you actually look at the testimony, not all of the women said they were afraid to leave. And the ones who said they were afraid to leave actually left and came back. So I think their conduct kind of vitiates our worry about the fact that they couldn't leave. And they didn't all see these extreme acts. One of the women testified that he never hit her. Two of the other women testified that he slapped them once for things that had absolutely nothing to do with actually going on commercial sex acts or not going on commercial sex dates. So if you look at the evidence as a whole, and don't just take the government's picture that's painted from some of the statements, you'll see that almost all of the women came, left, went back voluntarily. And that their testimony was consistently, you don't work, you don't get drugs. It wasn't you don't work, you get beaten. My clock's actually off, so I'm clueless. Okay, I show only a minute left, is that correct? So- I would love to reserve, I'm sorry, I couldn't see the time. I know, I didn't, we were so engaged. And so I'll give you two minutes for rebuttal. Thank you. Good morning. Good morning, your honors. I'm Kim Sayers Faye, and it's my honor to represent the United States. Now, are you handling all the argument you have someone here? I am, he's just assisting me with the voluminous excerpts of record. All right, so you have 15 minutes total. Thank you, your honor. Your honor, I too want to jump first to the drug quantity calculation. And specifically, I want to address Judge Kleinfeld's question, because I think that's very important. On this particular issue, there was imprecision, and we have admitted that with regard to the adult victims of trafficking. And because of that imprecision, I think the burden is on the government to show that the errors made was harmless. And that's where I'd like to go straight away. So your concession, I guess his question is, does your concession equal a remand on part of this anyway, or not? No, it does not. It does not, your honor, and I think that's a crucial point. And that's why I've prepared these sheets that I handed out before, and that I also gave to opposing counsel. This case was tried as a trafficking case. As the prosecution, we conceived of it as a trafficking case. But when it came time for sentencing, we realized, rather belatedly, frankly, that it would be sentenced as a drug distribution case. And that was because of sort of an anomaly with the guidelines at the time. At the time, they punished the trafficking or distribution of drugs more severely than the trafficking of people. So we were sort of late to appreciate that fact, but be that as it may, when it comes down to it, the sentencing guideline in this case was driven by the amounts of drugs distributed, and particularly to the underage individuals. Because there are two groups. There was a group of women trafficked who were over 21, and then there was the group of underage individuals. And the guidelines, again, punish drug distributions to persons under 21 more severely. You get a two point addition. So the court had to calculate two tallies. One for the drug distributions to the over 21, and one to the under 21. And it turned out that the drug distributions to the under 21 group ended up being the same offense level as that for the adult victims. Even though it was a vastly smaller quantity, but because of the way the guidelines were structured. So I want to focus on that. Mr. Webster got concurrent sentences on everything. He did. And was the judge required to do that, or could the judge have given consecutive? I believe he could. Because you had a number of different victims, and you also had different charges. That's a good point. And I- Because it was 360 months, right? It was. So all the 360 months were concurrent, plus then there was a 240 month that was concurrent. Right. And just as a factual matter, that's of note, too, because on the sufficiency argument, even if his, in the unlikely event that he were able to overturn every count that he challenges. His 360 to life sentence would still remain on the unchallenged convictions for trafficking of minors. But I'm not certain whether he was at liberty to put those end to end. But it was at the end driven by the drug quantity calculations with regard to the minors. And principally with regard to the two underage individuals that he trafficked for the greatest period of time. And that was HB and ML. And we spent a lot of time at sentencing looking at the government's drug quantity calculation for the underage individuals. And I have given in these two handouts the calculation for those two people, ML and HB. Well now, under our framework, the court has to do this with caution. And give, and not, and when you have, this would probably be a class of case of when you have victims like this. Right. That, where it's all over the map, whether they, you know, how many dates they went on, how much drugs they got at any. So the court has to, does the court have to go to the lowest common denominator? Is there any case that says that? No, there is no case that says that. And to the extent counsel cited the Valdez case, I know that you cannot cite unpublished dispositions from this court prior to 2007. And there is no other authority cited in their brief for that proposition. What the court has said, and I think what Judge Holland very much had in mind, was certainly you need to proceed with caution, you need to be conservative. Judge Holland was the district court judge who was reversed in the Shield case, where you might recall he adopted a drug quantity calculation that was but 1% over the threshold. And this court sent it back and said, no, that's too close to call. When you've got a 1% error, and you've got some guesstimation or estimation involved, you have to give the defendant the benefit of the doubt. So Judge Holland was very concerned in this case with the methodology. And for that reason, the government endorsed estimates for the underage individuals that were very conservative. And I've taken this chart. Wait a minute, I'm confused here. You've got this sentence on page 51. This approximation is sound, but unfortunately included a line item for  this 1155 gram line item should not have been included. That's true. So it looks like it's just a flat out concession of error. It is a concession of error, but your honor, in this case, error does not warrant reversal under Garcia-Guizar. Thought it did if it would produce a different guideline level, and it wouldn't if it didn't. You're again right, and it does not produce another guideline level, and that's the crucial point. You're exactly right on the law. If this altered the guideline, we would have to reverse, but it doesn't. Even if you take out that 1155 grams, and that's what I've shown on this first page that I've given you. And by the way, in red, I have provided the evidentiary support, the actual citations to the record, to the testimony of these witnesses that support the variables. So for the number of sex acts per day for ML, it was three. The testimony at 1-245 was that it ranged from zero to ten. So again, we chose something that was very low within the range. How much crack did she receive for each commercial sex act? One gram. The testimony was consistent with that as well, also at SCR 1-214. The days trafficked for week. She said most of the time she worked seven days a week. We chose five. Why did we do that? Because some of the witnesses, not this one, but some of the witnesses said that when they were after several days of a crack binge, they would eventually have to sleep, and we know that people have to sleep. So again, we erred on the side of caution and chose five. Weeks trafficked, it's 100. There is nothing, defendant points to absolutely nothing to show that that is clearly erroneous. So when you multiply those out, including the 69.5 weeks trafficked as well, you come up with 2.5 kilograms of cocaine. And again, we must remember the court is giving him the benefit of the sort of fictional notion that this was all powder, although it absolutely was not, as Judge Holland found. There's 2.5 kilograms of powder distributed to this witness alone. So the powder to crack is to the defendants. Absolutely, because at the time- What's the ratio, what, 30 or something? Well, now it is 30. At the time, it was 100 to 1. Right, so there's a huge benefit to the defendant in terms of that. And it's now lesser, but still significant, 30 times. So for every gram of crack that, he had to distribute 30 grams of crack to get credit for one of them, in other words. But the total for this particular woman was 2.5 kilograms. And then we have to look also to the drugs Webster distributed to HB. Again, on the second sheet, she testified to five to ten dates per day, but usually five. In fact, her testimony was at least five. We chose five. How much crack did she receive for each trip? We chose 0.8. Her testimony was 0.7 to 1.0. Again, we chose a low end of the spectrum. Most times she worked seven days a week. We chose five. Weeks trafficked, it's undisputed at 105. When you multiply that together, it's 2.1 kilograms. You add that 2.1 to the 2.5. I keep getting confused in the argument because you say what we chose, we being the prosecutors, but the prosecutors don't get to sentence. Correct. That's correct, Your Honor, and I apologize for misspeaking. This is the same chart that I went through with Judge Holland. And at the end of this exercise, he said, I believe that the government's good as can be done, and he adopted those estimates precisely. So I believe that he adopted, implicitly adopted, the analysis that undergirds them. Because I think we have to assume that Judge Holland does not pick a number out of the air after we spent hours going through these charts. Now, how does all of this account for the error? The error is still there. There is an error. The total, by the way, is 4.6 kilograms for these two women. Just those two women. And then you have to add the other two underage individuals to whom together there was 0.4 kilograms. So we get 5.1 kilograms. Now, what's the import of that? Well, 5.1 kilograms is still in the same, would still dictate the exact same sentencing guideline as the district court applied. There would be no change whatsoever. And defense has suggested, and I think created this erroneous notion, that there was a 50% discount taken. There was nothing of the kind. What Judge Holland said when he was evaluating and adopting the government's proposed calculations was, look. First he said, look, there's the laundry list of things in this case that are discounted in defendant's favor. There's the fact that all of the cocaine is being treated as powder rather than crack. There's the fact that we're not counting the drugs he distributed at the picnics and family barbecues, although we know that it was voluminous. We're not counting that the drugs that he had the women distribute to the Johns who were the patrons of his sex services. We can't, but I know it existed, I can't quantify it, but that's very much in his favor. And then he simply went on to say, and on the other hand, there's still a significant margin for error. Because even if one reduced it, even as much as 50%, we'd still be in the same guideline. He wasn't adopting a 50% discount. If you look at the statement of reasons and the drug quantity calculations, he adopted 6.2 for the underage individuals and 29 for the adults. So it's- Before you run out of time, I do have a different line of questions I need to ask you. Yes, please. If it is correct that the coercion was no dope if you don't have- go on dates. It strikes me as arguably significant, and I want to ask you about that. The record is, it's incredibly disgusting to read this stuff. But it looks as though the one thing he didn't beat them up for was not having sex. They could have sex, not have sex, even let them leave the house, go to a rehab program. It looks like what he beat them up for was that he had an exclusive dealership arrangement with them. Kind of like in a franchise case, and here they are buying crack from somebody else. And he'd beat them up for that, and he'd beat them up for violating house rules. I can't remember what all the house rules were. But it looks like the testimony was, they don't have to have sex. They can go on dates and not have sex. They can turn a John down. Is your case that the reason that what the coercion was was denying them dope if they didn't go on dates? That was not the case that we presented to the jury, your honor. We, of course, wanted the jury. We don't want to lie to the jury. He did ply them with crack cocaine. It was the currency with which he paid them for their commercial sex acts, and that was not coincidental. It's a highly addictive drug. And then he insisted on being the sole source of that drug. Again, because that gave him more power. You're giving me a jury argument now. You're really not helping me with the distinctions. Okay. If what's supposed to be the coercion is the crack, I have two problems with that. One is, the testimony is they're crack addicts before they ever come to them, and they buy crack in various ways, sex evidently being the most efficient way to produce value in exchange for them. And then I look at the statutory definition of coercion, and it says, threats of serious harm to or physical restraint against any person. Well, that wouldn't include crack or any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person, or the abuse or threatened abuse of law or the legal process. And I don't see how any of those things fits crack. So you go back to force, and he certainly used lots of force. Right. And force is not- Just a business man, but the force has to be to make them have sex. Well, let me give you one example of force that made them have sex, because this is one that Webster completely ignores in his brief. And I'm looking here at the testimony of Jessica Houser at SCR 1166. Did you ever refuse to go on a date while you worked for Jerry Starr's service? Yes. Do you remember that situation? Yes. What happened? He wanted me to go on a date with Sharon out to Eagle River. When you say you wanted to go on a date, Jerry wanted me to go. Did you want to go? No. Why not? I didn't feel like going. What happened? He grabbed me by the hair, but by the time I was done crying and he tried to put makeup on and go, Sharon had already left. So you didn't end up going on that date? No, I did not. How did he grab you by the hair? By the top of your scalp? Because there was a demonstration? Yes. Had you ever refused to go on a date before? No. Did you ever refuse to go on a date? No. And this was by the same witness, by the way, who testified that when he ordered her to eat... Page number again? Yes, Your Honor. SCR 1166 and 67. There's also another witness, I believe it was Ashley Scroggs or Brenda Ross, who testified she was scared into going on dates. They all testified that they were scared of Jerry Starr. When this woman, he ordered her to eat food off the floor, I asked her, did it occur to you to tell him no? She said, absolutely not. It didn't occur to me to tell him no. You didn't say no to Jerry, which is also what Raina Sullivan said. You didn't say no to Jerry. And when you have the tar beat out of you for minor things, when you're threatened with a pot of boiling water for perhaps having had a man in the house, when you are threatened for not coming home on time or looking at someone's process... That's exactly what I'm saying. It has tentacles into all of it. It's Todd plus so much more. That's exactly what I'm saying. You can't. And that's, I think, compelled by this Court's decision in Neville's and more recently in Dan. You have to take the record as a whole. You can't cherry pick things and say, well, they came and they left. What about, did the Court have to define power or... It didn't have to define force. Force, rather. I'm sorry. But, and I would note, too, that when evaluating the jury instruction, you have to take them as a whole. There were not one, but three instructions on force. I instruct you to use the ordinary, everyday definitions of fraud and force. Force is defined as any form of violence, compulsion, or constrained exercise for or against a person. And then finally, there was the instruction on the defense theory of the case. And this is what I think just decimates their argument, and they never deal with it. The defendant contends that he's not guilty of sex trafficking by force, fraud, or coercion because the individuals who engaged in commercial sex acts did so voluntarily and as a matter of choice. If you so find, you should find the defendant not guilty. And in fact, as to one of the women, they acquitted him with regard to trafficking her during her adult period of her life. So they knew how to follow this instruction, and they did. But they didn't find that any crack use by these victims was voluntary and that they outright rejected their theory of the case, which is these are crack-addicted prostitutes who voluntarily submitted themselves to them. All right, you've exceeded your time, but if any of the panel members have questions, we'll entertain them. All right, thank you very much. Thank you for your argument. All right, and I'll give you two minutes for rebuttal. Thank you. I'll try to hit both points. On the judge's findings, the government argues that he didn't apply a 50% reduction. And that's at page 733, 734 of the supplemental excerpts of record is the sentencing provision, and it's repeated in my brief. But he said, I'm looking at 35 kilograms. If I chop it in half, that gives us 17. That keeps us at a 34. So I think when the government says he adopted implicitly all of their numbers, he adopted implicitly all of their numbers and then chopped them in half and said, I get the same sentencing level. So that is error. And when Judge Kleinfeld asked about the error at page 51 of their brief that's conceded about the 1.1 kilograms, that alone doesn't change the level. But when taken in consideration with the fact that the 5.1 kilograms that the under 21 now stands at, you chop that in half and you drop down to a 28. So it's a significant difference in the guidelines. And I would just like to briefly try to respond to some of the fraud, force, and coercion things that my opponent said. Jessica Houser, the one who got her hair pulled for not going on a date, that's the only incident like that that's testified to. And she also testified- I'd like the prosecution to, the appellee, do this, but should we use initials for these people? Or I don't know. We need to use initials for the minors, and only ML and SH were minors. Okay. So I'm sorry. I can use initials instead. That's all right. I just know that there's always some concern. People don't really want to be identified. I understand. So JH said she didn't always feel like working there, but she wasn't recruited by force. She told the grand jury she was free to leave. She actually testified about leaving for another job. Didn't like it. Didn't work out. It came back. So when you look at all of her testimony as a whole, the one isolated incident that the prosecution read to you, if that is the basis for force, fraud, and coercion, she's the only one who testified like that. And the rest of her testimony is really clear. But can you cabin one witness's testimony to just one witness? I mean, generally the way that trials work, you can't. I mean, this is, it's a more involved scheme. The way Todd was decided is he apparently was, he beat one of the four women in front of the other four women regularly. And so that was that scheme. Like, he didn't have to beat them individually. But these things were not, most of them had nothing to do with the other women. The incident with J.H., there was no one else there. So it wasn't being used as some sort of part of his modus operandi or plan. It was one of those, just one of many of the random acts of violence. But it doesn't support the conclusion that the sex trafficking was going on 24-7 as a result of force, fraud, and coercion. Yes, Judge Kleinfeld has another question for you. So please, even though we are in overtime, we want you to answer it. Because we want the judges to have their questions answered too. I'm thinking about Judge Callahan's question. And I'm trying to imagine the mental process of a victim. Suppose you live with somebody who is very violent. I suppose one way you could deal with it, when you've observed a great deal of violence, is by figuring out what his rules are. And as long as you don't break his rules, whatever they are, you're okay. Your argument is basically that you could figure out what his rules are. And the rules did not include, you have to have sex when we get a call for a date. The other way would be, you're not that smart. You don't do the sociology of it and figure out what the folkways of the house are, what the rules are. Instead, you just figure, wow, I live with a really violent, scary person. I better do whatever he wants. It seems to me that the question of parsing would depend some on how smart and how good a sociologist or anthropologist the victim is. Why couldn't we just assume that if it's a household pervaded by violence, that they're just going to be scared of the guy and do what he wants? I don't think the statute extends to that level, that we can make that conclusion. I think that you have to have overt acts of fraud, force, or coercion that cause a commercial sex act. What you're trying to do is get into the psychology of- Why wouldn't that cause it? I mean, if you terrorize people, why wouldn't that cause them to do whatever they think you want? Well, you would also have to assume they had a rational belief that they couldn't leave. That terror combined with the rational belief they couldn't leave. And I think that their conduct demonstrates that they did believe they could leave. Two of the people who testified about the absolute worst instances of violence left, went to the lower 48, got clean, went on vacations, went to see their families, and they came back. They voluntarily came back to that situation. And so they did not have a rational belief that they could not leave. So they weren't under that psychology that you're talking about completely. I mean, there obviously was some abuse, but I don't think it rules whether or not the elements of the statute are met. All right. I think we've held both of you over, but I want to thank both of you for an excellent argument in a very fact-specific and complicated case. You both were very articulate and had a command of the record. Thank you.
judges: B Fletcher, Kleinfeld, Callahan, Cjj